**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JENNIFER SUNDBAKKEN, individually and as parent and next friend of E.S., a minor,<br><br>Plaintiffs,<br><br>v.<br><br>SPECIAL SCHOOL DISTRICT OF ST. LOUIS COUNTY, and MEHLVILLE R-IX SCHOOL DISTRICT,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. _______________ |

**COMPLAINT FOR JUDICIAL REVIEW OF ADMINISTRATIVE DECISION UNDER THE INDIVIDUALS WITH DISABILITIES EDUCATION ACT (IDEA)**

Plaintiffs Jennifer Sundbakken, individually and as parent and next friend of her minor daughter, E.S., for their Complaint for judicial review of the October 7, 2026 Decision of the Missouri Administrative Hearing Commission under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 *et seq.*, state as follows:

**INTRODUCTION**

1. E.S. is a thirteen-year-old girl with autism and an emotional disturbance whose intelligence is in the normal range. Her disability-driven aggression and dysregulation, which Defendants left without in-person behavioral supports, and not any cognitive limitation, are what stand between her and a free appropriate public education.

2. From April 2024 through the filing of her due process complaint in June 2026, Defendant Special School District of St. Louis County ("SSD") educated E.S. almost entirely through a laptop screen. It provided six, and later roughly eight, hours of virtual instruction per

week, with no peers, no adult in the room, and no in-person behavioral services, under a board policy that categorically bars homebound services in the home of any child with a history of behavior.

3. Every IEP in that period described homebound instruction as temporary, pending a private separate placement. None contained a plan to move E.S. out of the home. SSD's own placement coordinator testified that from Southview, SSD's public separate school, through July 2026 she saw no progress in E.S.'s ability to enter a school building, regulate near peers, or regulate around unfamiliar adults. During those two years, without the behavioral services her own IEP team had identified as necessary, E.S.'s behavior escalated into repeated emergency calls and psychiatric hospitalizations.

4. The one private day school SSD attempted to place her in discharged E.S. after five days as beyond what it could safely serve. Every other day program declined her or lacked essential resources to service her. SSD then searched nationwide for a residential placement and paid a consultant to help find one, yet its coordinator testified she would not mark residential on E.S.'s IEP even if a residential school with an accredited educational program became available, and would instead treat the residential cost as the parent's private responsibility. After Ms. Sundbakken located a residential facility in June 2026 and requested placement, SSD issued a Prior Written Notice refusing the parent's request to change E.S.'s placement to residential on the ground that homebound instruction showed "progress on IEP goals."

5. The Administrative Hearing Commission (the "Commission") found no violation of the IDEA by either district. In doing so it applied out-of-circuit residential-placement tests and never cited or applied the controlling Eighth Circuit standard; treated the unavailability of a willing residential school as proof that homebound was E.S.'s least restrictive environment; treated a

document reciting a categorical board policy as evidence of individualized decision-making; measured "progress" by first- and second-grade skills for a seventh grader of average intelligence; and decided the case on a record from which it had excluded the parent's evidence of pre-June 2024 seclusion and restraint, approximately two hundred exhibits, numerous district staff, and the opinions of E.S.'s treating clinicians, while relying on pre-June 2024 evidence and clinical opinion favorable to SSD.

6. Plaintiffs ask the Court to receive the administrative record, hear additional evidence, reverse the Decision, and grant the relief necessary to provide E.S. a free appropriate public education.

**PARTIES**

7. Plaintiff Jennifer Sundbakken is the mother of E.S. and resides in St. Louis County, Missouri, within the boundaries of Defendant Mehlville R-IX School District. She brings this action individually, in the exercise of her own rights under the IDEA, *Winkelman ex rel. Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 533 (2007), and as parent and next friend of E.S. under Federal Rule of Civil Procedure 17(c).

8. E.S. is a minor and a "child with a disability" within the meaning of 20 U.S.C. § 1401(3). She is eligible for special education and related services under the categories of autism and emotional disturbance. Consistent with Federal Rule of Civil Procedure 5.2(a)(3) and Local Rule 2.17(A)(2), her initials are used in this Complaint.

9. Defendant Special School District of St. Louis County is a special school district organized under Missouri law, a local educational agency within the meaning of 20 U.S.C. § 1401(19), and a recipient of federal IDEA funds. SSD is responsible for providing special

education and related services to eligible students residing in its component districts, including E.S.

10. Defendant Mehlville R-IX School District ("Mehlville") is a public school district organized under Missouri law, a component district of SSD, a local educational agency within the meaning of 20 U.S.C. § 1401(19), and E.S.'s district of residence. Mehlville shares responsibility with SSD for ensuring that E.S. is provided a free appropriate public education and that a continuum of alternative placements is available to her.

## JURISDICTION AND VENUE

11. This Court has jurisdiction under 20 U.S.C. § 1415(i)(2)(A) and (i)(3)(A), which authorize any party aggrieved by the findings and decision of a state due process hearing to bring a civil action in a district court of the United States without regard to the amount in controversy, and under 28 U.S.C. § 1331.

12. Mo. Rev. Stat. § 162.962(3) likewise provides that judicial review of the Commission's decision may be instituted by filing a petition in a state or federal court of competent jurisdiction.

13. Venue is proper in this District and in the Eastern Division under 28 U.S.C. § 1391(b) because both Defendants are located in St. Louis County and the events giving rise to this action occurred there.

14. Plaintiffs exhausted their administrative remedies by filing a due process complaint with the Commission, Case No. 26-0821, and litigating it to a final decision. The Commission issued its Decision on October 7, 2026. This Complaint is filed forty-four days after the Decision was issued. It is therefore timely under 20 U.S.C. § 1415(i)(2)(B), whether measured by the ninety-

day federal period or by the forty-five-day period that Mo. Rev. Stat. § 162.962(3) prescribes for appeals filed in state court.

15. Plaintiffs are aggrieved by the Decision, which denied all of their requests for relief.

## STANDARD OF REVIEW

16. In an action under 20 U.S.C. § 1415(i)(2), the Court "shall receive the records of the administrative proceedings," "shall hear additional evidence at the request of a party," and, "basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C); *see also* Mo. Rev. Stat. § 162.962(1).

17. The Court conducts an independent review of the record, giving "due weight" to the administrative proceedings. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982); *K.E. ex rel. K.E. v. Indep. Sch. Dist. No. 15*, 647 F.3d 795, 803 (8th Cir. 2011). No deference is owed to the Commission's conclusions of law, to findings resting on an incorrect legal standard, or to findings made on a record from which material evidence was improperly excluded. The weight due to the Commission's findings also depends on the care with which they were made, and the Decision contains the internal inconsistencies described below. The Court independently determines whether E.S. received a FAPE. The Commission's findings on mixed questions of law and fact, including whether an IEP was reasonably calculated to enable appropriate progress and whether a placement was the least restrictive environment, receive due weight only to the extent they rest on the correct legal standard and a complete record.

## PROCEDURAL HISTORY

18. On June 12, 2026, Plaintiffs filed a due process complaint against SSD and Mehlville alleging that Defendants denied E.S. a free appropriate public education ("FAPE") from June 2024 through the present.

19. On June 18, 2026, Plaintiffs gave Defendants written notice under 34 C.F.R. § 300.148(d)(1)(ii) of the family's intent to enroll E.S. in a residential placement and to seek reimbursement.

20. On July 6, 2026, the Commission dismissed claims arising under authorities other than the IDEA and denied, at that stage of the case, Defendants' request to limit the evidence to the two years preceding the complaint.

21. On August 7, 2026, the Commission allotted twenty-eight hours of hearing time, divided equally between the parties, notwithstanding that Plaintiffs bore the burden of proof and had disclosed 885 exhibits and 51 witnesses, roughly two-thirds of them District employees whom Plaintiffs were barred from contacting, against Defendants' 416 exhibits and 31 witnesses. The bulk of SSD's supplemental document production, over 15,000 pages, was served six days before the hearing.

22. On the afternoon of Friday, August 28, 2026, the business day before the hearing began, Defendants moved in limine to exclude evidence of seclusion and restraint (the cause of E.S.'s post traumatic stress disorder) and other events predating June 12, 2024; matters addressed in a February 2024 resolution agreement; a February 23, 2026 findings letter issued to SSD by the United States Department of Justice; and the opinion testimony of sixteen witnesses Plaintiffs had designated as experts, including E.S.'s treating psychiatrist and psychologist and the clinical staff at her current placement.

23. The Commission granted the motion in limine at the start of the hearing and memorialized the ruling by order of September 1, 2026 finding the excluded evidence "not relevant to the question of whether Respondents provided the student in this case a free appropriate public education." The order excluded testimony concerning restraint and seclusion predating June 12,

2024, the Department of Justice findings letter, and matters resolved by the parties' resolution agreement, and provided that the sixteen designated witnesses "shall be considered fact witnesses and shall not present testimony regarding future treatment recommendations for the student in this case." It added eight hours of hearing time but only informed the parties midway through the hearing that Defendants' cross-examination of Plaintiffs' witnesses would be counted against Plaintiffs' allotted time.

24. The Commission held the evidentiary hearing on August 31 and September 1 through 4, 2026. Plaintiffs made offers of proof on September 2 and 3, 2026, identifying by name and role the thirty-six excluded witnesses and by number and description approximately two hundred excluded exhibits, stating the substance of the proffered testimony, and moved for reconsideration or clarification to the extent the order was construed to bar categorically all evidence of events before June 12, 2024. The Commission denied reconsideration. On September 22, 2026, Plaintiffs tendered the excluded exhibits by electronic link and requested that they be preserved and taken with the case. Commission staff declined to retrieve documents provided by link, and the Decision recites that the documents had not been filed with the Commission (Decision at 4 & n.7). Plaintiffs made several attempts to upload the documents and, despite uploading them to the Commission's portal, they were not accepted.

25. On September 3, 2026, after SSD's placement coordinator, Melissa Wilson, testified that she had sent responsive emails that were not produced and had never searched her own account, Plaintiffs moved to compel production of her email. The Commission denied the motion and instead allowed limited additional examination of Ms. Wilson.

26. In addition to limiting the evidence presented in the hearing, the Commission also imposed limits on the briefing. The Commission ordered the initial briefs be limited to 20 pages

and the Reply briefs to 10 pages. Upon a request for clarification by Defendants, the Commission indicated the page limitation did not apply to the proposed Findings of Fact and Conclusions of Law sections. The parties filed proposed findings of fact, conclusions of law, and briefs on September 22, 2026, and reply briefs on September 25, 2026. On Defendants' motion, filed September 28, 2026 and granted in the Decision itself, the Commission considered only the first ten pages of each of Plaintiffs' reply briefs, disregarding the clarification that the limitation did not include Findings of Fact and Conclusions of Law. The disregarded pages of the reply to SSD contained Plaintiffs' argument under the controlling Eighth Circuit residential-placement standard, their continuum, evaluation, and *Endrew F.* arguments, the record of the parent's requests and Defendants' responses, and their rebuttal of Defendants' progress data. The disregarded pages of the reply to Mehlville contained Plaintiffs' proposed findings and conclusions as to Mehlville.

27. On October 7, 2026, the Commission issued its Decision finding that Mehlville and SSD complied with the IDEA and denying all of Plaintiffs' requests for relief.

## FACTUAL ALLEGATIONS

### A. E.S. and Her Needs

28. E.S. is thirteen years old and was a seventh grader at the time of the Decision. She has been diagnosed with autism spectrum disorder, emotional disturbance, and epilepsy, and by her treating psychiatrist with post-traumatic stress disorder, depression, generalized anxiety disorder, and obsessive-compulsive disorder. She is verbal and presents with an IQ in the normal range.

29. At all relevant times, Defendants knew that E.S.'s behavioral and regulatory needs, not academic ability, were the principal barrier to her education. Her IEPs and behavior

intervention plans identified physical aggression, inappropriate vocalizations, emotional regulation, and the inability to tolerate peers and unfamiliar adults as areas of need.

30. E.S.'s treating psychiatrist and psychologist diagnosed post-traumatic stress disorder related to restraint and seclusion at school and communicated the effect of those experiences to Defendants in letters provided in February 2025 and on May 21, 2025. Her treating psychologist testified that E.S. has a strong desire to be with other children.

**B. Removal to Homebound Instruction**

31. E.S. was moved from her Mehlville elementary school to SSD's public separate day school, Southview, in the fall of 2023. In January 2024, her IEP team determined that she was not making progress at Southview and that she required a private separate day placement. SSD's own records documented ninety-one behavioral incidents between September 13, 2023 and February 12, 2024, and its 2025 reevaluation recorded that, because of the number of behavioral incidents, E.S. began receiving full-time homebound services in April 2024.

32. Effective April 9, 2024, SSD amended E.S.'s IEP to provide 360 minutes per week of homebound instruction in reading and math, with language therapy, occupational therapy, and social work counseling delivered over Zoom, because a private separate placement was "currently not available." The amendment removed the 1,875 weekly minutes of direct adult support using applied behavior principles that E.S. had previously received. No direct applied behavior analysis ("ABA") service was provided.

33. SSD's homebound face sheets for E.S. stated: "STUDENT HAS DOCUMENTED ISSUES RELATED TO DISCIPLINE, BEHAVIOR OR SAFETY AND PER BOARD POLICY, HOMEBOUND WILL NOT BE OFFERED IN THE HOME." SSD's homebound administrator

testified that the policy was applied across the board whenever there were behaviors, and that E.S. was never offered in-person homebound instruction or any service in her home.

34. No SSD employee or contractor was ever sent into E.S.'s home for any purpose. All instruction over roughly two years was virtual. SSD's coordinator never asked any of E.S.'s homebound teachers whether they would work in the home, and in-home support was never offered. SSD's own homebound paperwork states that "homebound is not a school, and as such, cannot grant grades or credits," and Ms. Sundbakken has never received grades for E.S. Homebound instruction provided no grades or credit, no peers, and no access to art, music, physical education, or electives.

35. Even when E.S. attended every session, her limited homebound schedule provided approximately seventeen percent of the instructional time a typical student receives. Ms. Sundbakken repeatedly requested additional instructional hours, including at least fifteen hours per week, and those requests were not granted. During the 2025-2026 school year, E.S. accessed 178.40 of the 297 hours of homebound instruction offered.

36. Ms. Sundbakken was the only adult physically present to support, regulate, and redirect E.S. during instruction. SSD's coordinator acknowledged that E.S.'s behavior intervention plan contemplated crisis intervention, but no crisis team or safe space existed in the home, and that virtual instruction could dysregulate E.S. to the point of injuring herself or her mother.

37. SSD's coordinator testified that after Southview, the plan was always a private separate placement, that homebound was never the intended placement, and that she could not recall any IEP containing a transition plan.

**C. Behavioral Services**

38. Ms. Sundbakken repeatedly requested in-person ABA services for E.S., beginning in November and December 2023 and March 2024 and continuing within the limitations period, including in May 2025, August 2025, and November 2025, supported by E.S.'s treating psychiatrist. On October 23, 2025, SSD issued a Prior Written Notice refusing in-home ABA and offering only consultative ABA support to E.S.'s homebound instructors. The IEP contains no minutes for that consultation. The stated reason for the refusal was that E.S. is unable to tolerate new staff and is verbally aggressive toward them.

39. E.S.'s IEPs retained goals requiring participation in group activities and interaction with peers while placing her where no peers were available. The group-participation goal remained in the IEPs in effect during the limitations period, including the January 2025 IEP. The team described it as essential to prepare E.S. for a school setting, and SSD staff acknowledged that no one was taking data on it. It was later narrowed to interaction with staff only and then removed. No IEP contained a goal addressing E.S.'s documented need to tolerate peers or the introduction of new adults, and no IEP contained a transition plan to move E.S. from homebound to a less restrictive setting.

40. SSD's coordinator testified that from Southview through July 2026 she saw no progress in E.S.'s ability to enter a school building, to regulate near peers, or to regulate around unfamiliar adults, and that the progress she described was limited to academic IEP goals.

41. SSD's board-certified behavior analyst, who conducted the 2025 functional behavioral assessment, testified that E.S. would benefit from ABA, that ABA would be extremely helpful in both the home and school settings, that the support she recommended could have been delivered as a direct service, that she does not provide direct ABA to any student, that transitioning E.S. to a less restrictive setting would be beneficial, that no plan was developed to transition E.S.

back into a school building, and that she did not know whose job it would be to develop one. In response to the parent's requests for ABA, SSD's behavior analyst declined to provide services in the home and instead gave Ms. Sundbakken a list of private in-home providers to locate and fund herself. The private provider Ms. Sundbakken then contacted, Latitude, advised that at least two trained staff would be needed in the home and that virtual ABA would likely not help.

42. The social-emotional flexibility goal added in October 2025 was to be measured by teacher and behavior analyst observation. It generated a single data point, with no behavior analyst involvement.

43. In a recorded homebound session on August 18, 2025, E.S. asked three times to be taken on a hallway walk to see other students and was refused. SSD stopped hallway breaks after E.S. became dysregulated on seeing a peer, and later told Ms. Sundbakken that policy barred both hallway visits and virtual interaction with SSD peers. SSD never replaced those unstructured attempts with a planned, graduated program of peer exposure supported by trained staff, and no IEP contained one.

44. On January 12, 2026, Ms. Sundbakken reported that E.S. had become dysregulated during a virtual occupational therapy session, thrown her computer, and become aggressive, requiring a call to 911 and a trip to the hospital. Ms. Sundbakken asked SSD to replace the provider, who had restrained E.S. at Southview, and was triggering for her. SSD did not do so. The request to replace the social worker for the same reason was also denied.

**D. Academic Programming**

45. While homebound, E.S.'s academic goals were set at first- and second-grade skills, including identifying coins and telling time. By the 2025-2026 school year she was working on second- and third-grade math, scoring as low as twenty to fifty percent on grade-level material,

and her online math record reflected kindergarten- and first-grade-level tasks. Her occupational therapy goals remained substantially unchanged for two to three years. As of May 31, 2026, her two classes that tracked any grades reflected course grades of 32.03 percent in science and 55.48 percent in social studies. Her fine-motor goal regressed from 93 percent to 65 percent in a single quarter, and her February 2026 occupational therapy data showed she was not meeting her goal by a significant amount. Her executive-functioning goal remained at baseline because her mother assisted with most tasks.

46. The social-emotional and coping goals SSD reported as met were measured only in one-to-one virtual sessions with no peers present. E.S.'s homebound teacher described her time with E.S. as stagnant, with no losses and no gains, reported that when she increased the rigor of instruction the sessions became more difficult because of increased behaviors, and she never offered to make up the sessions E.S. missed.

**E. The Behavior Helper Academy**

47. In February 2025, after roughly eleven months of homebound isolation and with no transition plan, SSD placed E.S. at The Behavior Helper Academy ("BHA"), a private day school, on a full-day schedule, at a cost to SSD of $12,329.98 per month. Ms. Sundbakken had requested a gradual reintegration plan at the January 2025 IEP meetings. SSD's coordinator had suggested internally that, because E.S. had been out of school for so long, a half day might be needed to reacclimate her, and did not share that concern with Ms. Sundbakken. E.S.'s start was delayed because, as an internal SSD email of February 7, 2025 reflects, her transportation had been pulled and would not be available until March 3, 2025. E.S. attended BHA on February 28 and March 3 through 5, 2025.

48. During her first days at BHA, E.S. spent more than a third of each day in crisis intervention, including restraint and seclusion. Transportation failed after the fourth day, March 5, 2025. BHA's director warned the IEP team on April 4, 2025 that the gap in attendance would produce a significant escalation of behaviors, and on April 28, 2025 that the existing behavior intervention plan was not successful. When E.S. returned on May 13, 2025, BHA discharged her that day, stating that her needs exceeded what it could safely and effectively provide, and its director concluded E.S. needed a higher level of care than the three-to-one staffing and individual classroom they were providing.

49. SSD returned E.S. to homebound without additional instructional minutes. SSD had terminated E.S.'s homebound academic instruction on February 27, 2025 and did not resume it until April 7, 2025, and transportation, a related service, failed from March 5 until May 13, 2025. Between February and May 2025, E.S. did not receive the occupational therapy and speech-language services her IEP required. SSD's August 25, 2025 Prior Written Notice refused compensatory occupational therapy and language therapy on the ground that E.S. had made progress on those goals without the services, and added ten minutes per week to each service from August 25 through December 19, 2025.

**F. Evaluation**

50. SSD's school psychologist raised the possibility of emotional disturbance in March 2024. SSD did not evaluate E.S. for emotional disturbance until its August through October 2025 reevaluation, which found her eligible under that category. SSD also abandoned cognitive and achievement testing after a single attempt and never obtained that data. That attempt, in February 2024, was made by an examiner unfamiliar to E.S., after SSD's school psychologist told Ms.

Sundbakken he would first integrate into E.S.'s classroom so she could get to know him. SSD made no second attempt.

51. Ms. Sundbakken raised a suspected specific learning disability in December 2023 and repeatedly thereafter. On June 27, 2025, SSD was informed that a private reading program had screened E.S. with the LAC-3, that she scored in the sixth percentile for phonemic awareness, and that the results indicated possible dyslexia. Ms. Sundbakken requested a comprehensive educational assessment on August 25, 2025, and told SSD's school psychologist on August 29, 2025, that she was concerned E.S. had learning disabilities. After a three-day trial, the NOW! reading program offered to begin instruction immediately; Ms. Sundbakken asked SSD to fund it on June 27 and July 31, 2025, and SSD refused in its August 25, 2025 Prior Written Notice. The October 2025 reevaluation did not evaluate E.S. for a specific learning disability.

52. SSD's emotional disturbance worksheet documented clinically significant aggression scores from all raters, and its reevaluation documented each characteristic of emotional disturbance as existing over an extended period of time and to a marked degree.

53. The reevaluation and functional behavioral assessment relied on virtual observations conducted largely off camera during preferred instruction, with Ms. Sundbakken the only other person present. The behavior analyst had never before conducted a functional behavioral assessment virtually in more than one hundred assessments and never observed E.S. in person. When E.S. saw the analyst's name on the screen during the first observation, she became dysregulated. SSD relied on the absence of observed behaviors in those sessions to deny direct ABA services.

**G. Escalation, Hospitalization, and the Search for a Residential Placement**

54. During the 2025-2026 school year, with no in-person behavioral services in place, E.S.'s behavior escalated. Emergency responders were called to the home repeatedly; an emergency medical technician testified that community paramedics responded to approximately fourteen calls beginning in the fall of 2025, at least one of which required chemical sedation, and E.S. was hospitalized on multiple occasions in the spring of 2026, at times for weeks. By February 26, 2026, Ms. Sundbakken had called for emergency support seven times and E.S. had been hospitalized three times in the preceding two weeks. Ms. Sundbakken reported those events to the full team that day. She had earlier reported that E.S. could no longer be taken to playgrounds or into stores. E.S.'s treating psychiatrist testified that E.S.'s depression worsened the longer she remained unable to return to a school setting. During her hospitalization, E.S. was maintained on three-to-one staffing.

55. At the February 26, 2026 meeting, Plaintiffs' counsel told the team that E.S. needed a residential placement now. SSD issued no response to that request until July 13, 2026.

56. No local day program that could meet E.S.'s needs would accept her. The Center for Autism, on whose waitlist E.S. had been held for more than a year, declined her in August 2025 because it could not support three-to-one staffing or give her a classroom of her own. JTC Academy had no ABA and no on-site occupational or speech therapy, and SSD's coordinator acknowledged that its facility was not fully set up for students. KVC did not provide ABA, and KVC's residential program declined E.S. in January 2026, citing her seizure disorder and acuity. SSD's coordinator testified that she would never again recommend a placement offering only one-to-one support and that E.S. requires at least two-to-one staffing in a setting offering at least what BHA had provided. Beginning in late 2025, SSD and Ms. Sundbakken searched for a residential

placement. In April 2026, SSD contracted with Cornerstone Therapeutic and Educational Consulting to locate a residential placement. Dozens of programs declined E.S.

57. Several residential programs asked SSD to confirm that it would fund a placement. Perimeter informed SSD of its funding requirements. Lakemary Center, a program approved for Missouri funding, told Ms. Sundbakken it believed its program would be a fit and needed to determine funding with SSD. Chileda asked SSD on April 10, 2026, and again on April 20 and April 27, 2026, to confirm that SSD would fund E.S.'s placement if she were accepted. On December 10, 2025, SSD's social worker advised the coordinator that funding for a residential placement might be difficult. In November 2024 SSD had announced a projected $74 million deficit and cost-containment measures, and the coordinator testified that she must be conscious of cost when looking at placements. Residential programs quoted costs of $1,000 to $3,000 per day.

58. On March 27, 2026, SSD's coordinator told Ms. Sundbakken that if a placement were located the IEP would be amended to a residential placement. In June 2026 Viewpoint Center, a program with an academic component, accepted E.S., and Ms. Sundbakken asked SSD to approve the contract. On June 10, 2026, E.S.'s treating psychiatrist provided a letter recommending long-term residential placement with twenty-four-hour therapeutic supports. E.S.'s treating psychiatrist had joined the residential search in the fall of 2025, and her treating psychologist believed E.S. could not learn to regulate around peers at home and would succeed in a residential setting. On June 11, 2026, the coordinator told Ms. Sundbakken that a team meeting would be needed to determine whether homebound was still the appropriate placement and that she had been hoping insurance would pay. SSD declined to fund transportation to Viewpoint, quoted at $6,500 to $7,500, and when asked to fund transportation to Nexus responded, "Is this something that insurance would cover?"

59. SSD never changed E.S.'s IEP placement to residential. Its coordinator testified that she would not mark residential on E.S.'s IEP even if a residential placement with an approved educational component became available, that she would instead mark private separate and treat the residential cost as the parent's private responsibility, that she had never believed E.S. should be placed residentially, that no one at SSD had responsibility for residential placements, that SSD hired Cornerstone because no one at SSD had that experience, that in twenty-six years she had never been in an IEP meeting in which a child was placed residentially, and that she had no training on residential placement. She also testified that if an IEP team determined a child needed residential placement, the team should write that into the IEP regardless of immediate availability and the district should continue searching; that homebound is more restrictive than a residential placement; that no private separate placement is currently available to or willing to accept E.S.; that residential programs remain that neither she nor Cornerstone contacted; and that after SSD adopted a policy barring secure observation rooms in its own and contracted settings she had not re-approached any facility. The Commission's finding that E.S. is "welcome to attend" JTC Academy (Finding 194) concerns a program that, as SSD's coordinator acknowledged, lacked ABA, on-site therapies, and a finished facility.

60. On June 26, 2026, E.S. was admitted to Nexus Children's Hospital in Texas. There, with in-person ABA support and gradual exposure, she began joining social groups, forming friendships with peers, and tolerating trigger words. Nexus's behavior analyst reported that E.S. needs to be around other children, that virtual instruction is not helpful to her, and that she should be placed in a school setting rather than at home. On July 20, 2026, at a meeting Ms. Sundbakken arranged, SSD personnel and Cornerstone met with the Nexus providers, and SSD's own behavior analyst acknowledged that E.S. was making progress. The Nexus providers advised that no one

person should be alone with E.S. during a crisis and that she could not safely be at home without trained crisis support and a safe space, neither of which exists in the home.

61. On July 13, 2026, SSD issued a Prior Written Notice refusing Ms. Sundbakken's request to change E.S.'s placement from home/hospital to a private residential facility, "due to the student's homebound instruction providing current academic supports show[ing] progress on IEP goals." The July 2026 IEP continued homebound instruction, with zero percent participation in regular education. SSD's coordinator proposed that SSD deliver homebound services wherever E.S. was residing. At the July 2026 IEP meeting, SSD proposed to keep a coping-strategies goal that listed lying on her couch or talking to her mother as E.S.'s strategies, although E.S. was then living in Texas. On July 30, 2026, Ms. Sundbakken notified SSD that insurance approval for Nexus ended August 3, 2026 and that a residential placement was needed by that date. The coordinator responded by requesting discharge paperwork and stating that E.S. would need to remain enrolled with Mehlville and Southview.

62. E.S. received no services from March 4 to April 3, April 13 to April 24, and May 11 to May 21, 2026, and received none of the extended school year services that the May 15, 2026 amendment scheduled for June 1 to 25, 2026. That amendment contained no ABA and no peer-interaction or transition goals. SSD offered no make-up sessions or alternative means of delivery, and has not offered compensatory services for the instruction and related services she missed during the 2025-2026 school year. When Ms. Sundbakken notified SSD that services had to be placed on hold because of E.S.'s hospitalization, she asked SSD to continue documenting scheduled services and missed sessions.

63. On October 12, 2026, Plaintiffs gave Defendants written notice under 34 C.F.R. § 300.148(d)(1)(ii) of their intent to enroll E.S. in a residential program at Nexus Neurorecovery

Center in San Antonio, Texas, a program distinct from the acute hospital admission described in paragraph 60, and to seek reimbursement. The school at Nexus Neurorecovery Center is a charter school approved by the Texas Education Agency. The Commission's statement that Nexus lacks an accredited educational component and does not provide special education services (Decision at 47) is not accurate. Both Nexus Children's Hospital and Nexus Neurorecovery Center offer accredited educational components and special education services, and Plaintiffs will offer evidence of the educational programs under 20 U.S.C. § 1415(i)(2)(C)(ii).

**ERRORS IN THE COMMISSION'S DECISION**

The Commission's Decision is deficient in that it mischaracterizes evidence, misstates facts in evidence, relies on facts not in evidence, fails to consider evidence, is contrary to the preponderance of the evidence, and rests on errors of law, including the following.

**A. The Commission Applied the Wrong Residential-Placement Standard**

64. Under binding Eighth Circuit law, a district must fund a residential placement where the student, because of her disability, "cannot reasonably be anticipated to benefit from instruction without such a placement," and the controlling question is not whether a problem is educational or non-educational but whether it must be addressed for the child to learn. *Indep. Sch. Dist. No. 284 v. A.C. ex rel. C.C.*, 258 F.3d 769, 774, 777 (8th Cir. 2001); *cf. T.F. v. Special Sch. Dist. of St. Louis Cnty.*, 449 F.3d 816, 821 (8th Cir. 2006) (distinguishing *A.C.* where not all experts concluded residential placement was necessary); 34 C.F.R. § 300.104.

65. The Commission did not cite or apply *A.C.* or *T.F.* (Decision at 44-47). It instead relied on decisions from the Third, Fifth, Seventh, and Ninth Circuits, and decided the residential-placement question by characterizing Nexus Children's Hospital as a medical facility and noting that the parent's medical insurer paid for it (Decision at 47 & n.25), rather than by determining

whether E.S. required a residential educational placement during the period at issue. The Decision describes its first group of authorities as decisions of the Third, Fourth, and Sixth Circuits and then cites decisions of the Ninth and Third Circuits (Decision at 45-46). The Eighth Circuit in *A.C.* expressly declined to treat a disability-related emotional or behavioral problem as segregable from learning merely because it is not primarily educational. 258 F.3d at 776-77. That holding cannot be reconciled with the "primarily educational" and "segregable" tests the Commission applied.

66. The Commission adopted as findings SSD's position that the residential component of any placement would be paid by the parent's medical insurer and that SSD would pay only for a coextensive private separate educational placement (Findings 198, 219). That model is contrary to 34 C.F.R. § 300.104, which requires that a residential program necessary to provide special education and related services, "including non-medical care and room and board," be "at no cost to the parents of the child." Whether an insurer has paid for a placement does not answer the question *A.C.* poses.

67. The Commission found that "overwhelming evidence" established that E.S. "required psychiatric care" (Decision at 47) and credited testimony that she needed medical treatment before she could receive behavioral services (id. at 55, 58-59). BHA's director testified that E.S. would benefit from ABA integrated throughout her day. SSD's own behavior analyst testified that ABA would be extremely helpful at home and at school. E.S. began making behavioral and social progress once she received in-person ABA at Nexus. Under *A.C.*, a child's need for psychiatric, emotional, or behavioral treatment in order to learn supports, and does not defeat, the necessity of a residential placement.

68. The Commission also accepted SSD's distinction between school-based ABA, which builds skills needed to access education, and private ABA, which addresses behaviors

outside school, and described the private provider SSD recommended as addressing "behaviors unrelated to Student's ability to access her education" (Finding 143; Decision at 58). The record does not support that distinction. The behaviors at issue, aggression and dysregulation in the presence of peers and unfamiliar adults, are the behaviors that kept E.S. out of every school building, and under *A.C.* the question is whether they must be addressed for her to learn, not where they occur.

69. Unlike *T.F.*, this is a case in which the professionals with direct knowledge of E.S. concluded that she required far more than one-to-one virtual instruction at home. *See* 449 F.3d at 821. Her treating psychiatrist recommended long-term residential placement with twenty-four-hour therapeutic supports. Her treating psychologist believed she could not learn to regulate around peers at home. BHA's director concluded she needed a higher level of care than three-to-one staffing in her own classroom. The private ABA provider recommended intensive in-patient behavior therapy (Finding 154). The Nexus behavior analyst reported that virtual instruction is not helpful to her. SSD's own coordinator testified that she requires at least two-to-one staffing.

70. The Commission declined to decide whether residential placement is E.S.'s least restrictive environment, deferring that question to the same IEP team whose coordinator testified she would not place E.S. residentially even if a placement became available (Decision at 47).

71. The Commission found that Plaintiffs waived their claim for reimbursement of the cost of placing E.S. at Viewpoint (Decision at 45). E.S. was never admitted to Viewpoint. Any waiver was limited to that facility. Plaintiffs stated in their reply brief that the relief they sought was a prospective, district-funded residential placement of the type E.S. requires and was not limited to, and had not been waived by the current availability of, any particular facility. To the extent the Decision is read to find a broader waiver, it is in error.

72. The Commission stated that the issue before it was limited to the period from June 2024 to June 2026 and that whether SSD is currently providing a FAPE was not before it (Decision at 40 n.20). The Commission nevertheless identified the July 2026 IEP among the IEPs at issue (Decision at 51), admitted that IEP and the recordings of the July 2026 IEP meetings into evidence, made findings on the July 2026 residential-placement request and IEP meeting (Findings 216-219), and ruled that SSD provided E.S. a FAPE "during her stay at Nexus" (Decision at 47). The July 2026 IEP and Prior Written Notice were tried and decided. The Commission's statement limiting the period is inconsistent with its own rulings and does not bar review of them.

**B. The Commission Equated Unavailability with the Least Restrictive Environment**

73. A placement must be based on the child's IEP and individual needs, and the district must ensure that a continuum of alternative placements is available. 34 C.F.R. §§ 300.115, 300.116. In selecting a placement, the team must consider "any potential harmful effect on the child or on the quality of services that he or she needs." 34 C.F.R. § 300.116(d). Making FAPE available is the district's own obligation, and the refusal of private facilities to admit a child does not discharge it.

74. The Commission concluded that homebound was E.S.'s least restrictive environment because day schools and residential schools would not accept her (Decision at 55-56). That reasoning makes the placement a function of availability rather than need, and it is contrary to SSD's own coordinator's testimony that a needed residential placement should be written into the IEP regardless of availability. As in *A.C.*, the question is not whether the district can compel a particular placement, but who must pay for a residential placement that is educationally necessary. 258 F.3d at 779. Several residential programs asked SSD to confirm

funding, and the Commission itself found that some schools declined SSD's contract terms (Finding 201).

75. The Commission justified homebound instruction with authorities addressing when a child may be removed from the regular classroom (Decision at 53-54). No party contended that E.S. should be in a regular classroom. The dispute was between homebound instruction and a residential placement, and the Commission never compared the two. Home instruction sits near the most restrictive end of the continuum. 34 C.F.R. § 300.115(b)(1). The regulation lists forms of placement. It does not rank a residential school, where a child is educated alongside peers, below solitary instruction at home, and the restrictiveness of a setting turns on the child's opportunity to be educated with others. SSD's coordinator admitted that homebound is more restrictive than a residential placement, E.S.'s homebound teacher testified that homebound is the most restrictive placement on the continuum, and SSD's own IEP form lists public and private residential facilities above home/hospital. The Commission also made no finding on the harm the placement was causing, despite the emergency calls, hospitalizations, and loss of community access described above. *See* 34 C.F.R. § 300.116(d); *cf. Steckelberg ex rel. AMS v. Chamberlain Sch. Dist.*, 77 F.4th 1167, 1170 (8th Cir. 2023) (home-instruction IEP that left student at home without adequate academic support denied FAPE).

76. The Commission found that Ms. Sundbakken rejected the schools that accepted E.S. (Findings 15, 193-194, 203; Decision at 54-56). The record does not support that finding. The day program SSD offered in the spring of 2024 proposed to serve E.S. in a closet-sized space or the hallway, no SSD employee had observed the facility before recommending it, and SSD's internal response to the parent's concerns was, "if they are willing to take her, we make that her school assignment and they can refuse to send her." JTC Academy had no ABA, no on-site

occupational or speech therapy, and an unfinished facility. KVC's day program had no ABA, and KVC's residential program declined E.S. The Center for Autism declined her because it could not staff her three-to-one. SSD's coordinator testified that no private separate placement is currently available to or willing to accept E.S.

77. The Commission found that Ms. Sundbakken failed to inform SSD of E.S.'s medical status and, with Cornerstone, acted unilaterally and outside Cornerstone's contract in seeking a psychiatric placement (Findings 195, 206, 213; Decision at 55, 66). By March 18, 2026, SSD's coordinator was tracking E.S.'s hospitalizations and asked whether the hospital would keep E.S. until a placement was available. Ms. Sundbakken reported the emergency calls and hospitalizations to the full team on February 26, 2026. Cornerstone reported its hospital observations to the coordinator by email on May 26, 2026 and responded to her June 18, 2026 request for an update. The coordinator herself contacted Viewpoint and arranged for SSD to deliver homebound services there (Finding 215).

78. The Commission relied on statements by Ms. Sundbakken in 2025 that E.S. was doing well on homebound instruction and, in August 2025, that a residential setting was more restrictive than E.S. required (Findings 57, 63-64). Those statements preceded the escalation in the fall of 2025 that the Commission itself found (Findings 22-23; *see also* Finding 27). A parent's view in August 2025 of a placement she had not yet seen fail cannot fix E.S.'s needs after the emergency calls and hospitalizations that followed. Ms. Sundbakken requested residential placement no later than February 26, 2026.

**C. The Commission Treated a Categorical Board Policy as Individualized Decision-Making**

79. The Commission found that the homebound face sheet, which states that "PER BOARD POLICY, HOMEBOUND WILL NOT BE OFFERED IN THE HOME," "shows that

Respondent SSD considered Student's individual needs" (Decision at 58). A statement that services are withheld under a uniform policy is evidence of the opposite, and the homebound administrator confirmed the policy was applied across the board.

80. The Commission extended that reasoning to deny in-person ABA, occupational therapy, and speech-language services, without regard to whether those services could have been delivered safely through two-staff support, in another community setting, or otherwise, options SSD never considered. The homebound administrator testified that E.S.'s homebound placement was not medical homebound and that homebound instruction can be delivered in person. SSD's stated safety rationale is inconsistent with its placement of E.S. at BHA and its proposals to place her at other day programs staffed by adults.

81. The Commission found that E.S. "was a threat to the physical safety of any person in her presence" (Decision at 57-58). That finding confirms, rather than defeats, the need for a staffed placement. BHA served E.S. in her own classroom with a rotating team of trained adults, the hospital maintained three-to-one staffing, and SSD's coordinator testified that E.S. requires at least two-to-one staffing. SSD cannot maintain that several trained adults are necessary when a private facility serves E.S. but unnecessary when the only adult present is her mother.

82. The Commission characterized the refusal of direct ABA as a choice of methodology within SSD's discretion (Decision at 58). SSD did not select a different behavioral methodology. It provided none. E.S.'s IEPs contained no minutes of direct ABA and no minutes of the consultation described in the October 2025 Prior Written Notice. The Commission's finding that the team added one hour per month of ABA consultation (Finding 138) is not reflected in the IEP's service summary. SSD's stated reason for refusing in-home ABA, that E.S. cannot tolerate new staff, describes the deficit the service exists to treat.

**D. The Commission Misapplied the Endrew F. Standard**

83. An IEP must be "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances," and for a child not on grade level, "appropriately ambitious." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 399, 402 (2017). A failure to address behavior that impedes learning can itself deny a FAPE. *Neosho R-V Sch. Dist. v. Clark*, 315 F.3d 1022, 1028-29 (8th Cir. 2003). The question is whether each IEP, when written, was reasonably calculated to enable appropriate progress in light of what Defendants then knew. Where a child's lack of progress was predictable and known, it is properly considered. *Osseo Area Schs., Indep. Sch. Dist. No. 279 v. A.J.T.*, 96 F.4th 1062, 1066 n.4 (8th Cir. 2024); *cf. K.E.*, 647 F.3d at 808.

84. The Commission found that E.S. made "steady progress typical of a student with special needs" (Finding 99) and relied on mastery of first- and second-grade skills by a seventh grader of average intelligence, while disregarding the undisputed absence of progress on the behavioral and peer-tolerance needs that SSD itself identified as the barrier to her education. Each successive IEP continued a program that the IEP team already knew was not addressing those needs. The Commission found that E.S.'s instructors implemented her behavior plan by "refraining from pushing her when tasks were too challenging" (Decision at 53). A program that avoids dysregulation by withholding demands is not appropriately ambitious. SSD's social worker could not determine whether E.S. could apply any skill around peers, and the goals reported as met were measured where the disability could not appear. The progress findings on which the Commission relied (Findings 56, 80-85, 99, 106, 112-113, 118-119, 144) were measured in one-to-one virtual sessions with the parent present. They do not address the occupational therapy data showing handwriting falling from 78 to 68 percent and fine-motor skills from 93 to 65 percent, or the session logs recording repeated breaks, multiple prompts per question, and aggression triggered by hearing

peers through the screen. A failure to adopt a cohesive plan for a child's behavioral needs supports a finding that the child could not benefit from her education. *Neosho*, 315 F.3d at 1029. SSD offered no cogent and responsive explanation of how homebound virtual instruction would address those needs. *See Endrew F.*, 580 U.S. at 404.

85. The Commission held there was "no evidence" that SSD allotted insufficient instructional hours and speculated that E.S. could not have tolerated more (Decision at 57). The record showed that E.S. received a small fraction of a school week, that the hours were set by a placement default rather than individualized need, and that the parent repeatedly requested more, as the Commission itself found (Finding 63). *See A.J.T.*, 96 F.4th at 1066-67.

86. The Commission attributed any regression to an epileptic seizure it placed in "November 2024" (Decision at 56), while its own findings place that seizure in November 2025 (Findings 66, 74-75, 90). It made that medical-causation finding without supporting expert testimony, after barring E.S.'s treating clinicians from offering opinion testimony.

**E. The Commission Erred on Evaluation**

87. A district must evaluate in all areas of suspected disability and conduct a sufficiently comprehensive evaluation, and difficulty assessing a student does not excuse an incomplete one. 34 C.F.R. § 300.304(c)(4), (6); *Indep. Sch. Dist. No. 283 v. E.M.D.H.*, 960 F.3d 1073, 1080 (8th Cir. 2020). The child-find duty is breached where the district knows of the child's needs and fails to evaluate, regardless of any parental request. *Id.* at 1082-83; 34 C.F.R. § 300.111. The Commission excused SSD's failure to complete cognitive and achievement testing and its delay in evaluating for emotional disturbance, deeming the latter harmless even though the delayed evaluation was used to justify consultation-only behavioral services.

88. The Commission held that E.S.'s February 2024 behavior made cognitive and achievement testing impossible and distinguished *E.M.D.H.* on that ground (Decision at 48). SSD made one attempt, through an examiner E.S. did not know, and none in the two and a half years that followed. SSD completed observations, interviews, and rating scales in 2025.

89. The Commission disposed of Plaintiffs' specific learning disability claim as an untimely attempt to "bootstrap" the February 2024 testing into this proceeding (Decision at 48). It did not address the facts within the limitations period: the June 27, 2025 notice of a sixth-percentile phonemic awareness score and possible dyslexia, the parent's requests in August 2025, and an October 2025 reevaluation that did not evaluate for a specific learning disability. The Commission failed to rule on a timely claim.

90. The Commission credited SSD's functional behavioral assessments as reasonable efforts to address E.S.'s behavior (Decision at 53, 58). The 2025 assessment was conducted entirely by video, by an analyst who had never conducted one virtually, in the one setting in which E.S. had no peers, no unfamiliar adults, and her mother beside her. An assessment confined to that setting cannot identify a disability that manifests in the presence of others, and SSD then relied on the absence of observed behaviors to refuse direct ABA.

91. The Commission deemed the delay in evaluating for emotional disturbance harmless because classification is immaterial where services are tailored to need (Decision at 50-51). SSD's own records documented every characteristic of emotional disturbance over an extended period. The premise of the harmlessness ruling, that the IEP was tailored to E.S.'s needs whatever the label, fails where the evaluation needed to identify those needs was delayed for eighteen months while her IEPs contained no goal addressing peers or unfamiliar adults and no direct behavioral service.

**F. The Commission Erred on Implementation**

92. The Commission held that SSD had no obligation to provide or make up instruction and related services missed during E.S.'s hospitalizations, although the IDEA continuum expressly includes instruction in hospitals and institutions, 34 C.F.R. § 300.115(b)(1), and excused the months of missed occupational therapy and speech-language services in 2025, the failure to implement peer-interaction goals, and the absence of extended school year services in 2026. The instruction E.S. lost during her hospitalizations and in the summer of 2026 was the foreseeable result of a placement that did not address her behavioral needs, and it is properly remedied through compensatory education. The Commission relied on the parent's requests to pause virtual sessions and the absence of consent to delivery in the hospital (Findings 65, 67; Decision at 60-62). Those requests reflected that a laptop session could not be delivered to a hospitalized, dysregulated child. They did not relieve SSD of its obligation to offer instruction through some other means on the continuum, and SSD offered none.

93. The Commission treated instruction as provided whenever it was offered. E.S. accessed 178.40 of the 297 hours offered in 2025-2026. SSD's coordinator conceded that virtual instruction could dysregulate E.S. to the point of injuring herself or her mother. Sessions were cancelled when E.S. became aggressive as her mother logged her in, and one session ended in a call to 911. A district does not implement an IEP by offering a service through the only means of delivery it knows will prevent the child from receiving it, particularly where the district selected that means under a categorical policy and refused every request to change it.

94. E.S.'s behavior intervention plan could not be implemented in the placement SSD selected. The plan called for crisis intervention, restraint, and seclusion, and there was no crisis team and no safe space in the home. The ABA consultation described in the October 2025 Prior Written Notice appears nowhere in the IEP's services, and the behavioral goal requiring behavior

analyst observation was measured without one. Although the behavior intervention plan permitted teachers as well as the behavior analyst to collect data (Decision at 63), SSD staff acknowledged that there was no reason to review the plan because they were not doing much with it, and no behavioral data was collected on homebound.

95. The Commission found that the 2025 gap in occupational therapy and speech-language services resulted from a misunderstanding, was not material, and was compensated (Decision at 62). E.S. received neither service from approximately February 11 through May 19, 2025, under an IEP that called for sixty minutes per week of each. SSD added ten minutes per week to each service from August 25 through December 19, 2025, and in the same Prior Written Notice refused compensatory services on the ground that E.S. had progressed without them.

96. The Commission rejected the peer-interaction claim on the ground that the 2022 IEP and behavior plan are outside the limitations period and that the January 2024 IEP excused the goal (Decision at 63). The group-participation goal remained in the IEPs in effect during the limitations period, including the January 2025 IEP, and SSD staff acknowledged in January 2025 that the goal was essential and that no one was collecting data on it.

97. The Commission found that E.S.'s start at BHA was delayed by the parent's request for a female driver and aides (Finding 162) and that the parent did not permit contact with Nexus until the end of August 2026 (Decision at 63-64). SSD's internal email of February 7, 2025 shows that SSD had pulled E.S.'s transportation and that it would not be available until March 3, 2025. The request for female transportation staff was a reasonable requested accommodation supported by letters from E.S.'s psychiatrist and psychologist. Ms. Sundbakken asked SSD on June 22, 2026 to speak with the Nexus admissions team and arranged the July 20, 2026 meeting between SSD and the Nexus providers.

98. The July 2026 IEP continued a homebound placement for a child who was not living in the home, with no plan for how it would be implemented.

**G. The Commission Erred on Predetermination and Parental Participation**

99. A district that closes its mind to a placement before the IEP meeting denies the parent meaningful participation. *See R.L. v. Miami-Dade Cnty. Sch. Bd.*, 757 F.3d 1173, 1188 (11th Cir. 2014); *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 857-58 (6th Cir. 2004). These are the authorities the Commission itself recited (Decision at 64). The Commission did not address the coordinator's testimony that she would not mark residential on E.S.'s IEP under any circumstances, the July 13, 2026 Prior Written Notice refusing residential placement because of academic goal progress, or the categorical board policy. Nor did it address the coordinator's statement on March 27, 2026 that the IEP would be amended to residential once a placement was located, her statement on June 11, 2026 that a team meeting was needed to decide whether homebound remained appropriate, the absence of any response to the February 26, 2026 request for residential placement, or the evidence that cost informed Defendants' position. It instead faulted Ms. Sundbakken for declining a medical release. The record also shows that Ms. Sundbakken gave written consent in May 2022 for the school to speak with any of E.S.'s providers and supplied a list of them; told the team on June 5, 2025 that she supported provider contact "100%" and wanted to be part of the conversations; offered on August 25, 2025 to have E.S.'s psychologist collaborate with the team; signed releases for KVC, Hawthorne, and Lakemary; delivered letters from E.S.'s psychiatrist in February 2025, May 2025, and June 2026; and arranged the July 20, 2026 meeting with the Nexus providers. Ms. Sundbakken repeatedly offered to coordinate with medical providers; her reservation was simply that she be included in the conversations, not that they should not occur. The Commission's findings that Ms. Sundbakken

did not respond to an information-exchange request, did not allow SSD to communicate with providers, refused a medical release, and gave a release to Cornerstone that she withheld from SSD (Findings 121, 125, 195, 206) disregard that record, and SSD's coordinator agreed that Ms. Sundbakken was "an open book" who impeded nothing apart from the dispute over the form of a release.

100. The Commission found that SSD consistently considered the parent's input (Decision at 65). From January 2025 through July 2026 Ms. Sundbakken requested, and Defendants denied or did not answer, additional instructional hours, in-person occupational therapy, in-home ABA, a functional behavioral assessment in the home, an exception to the board policy, structured peer exposure, goals addressing peers and new adults, a written transition and reintegration plan, private providers in the home, and residential placement.

101. The Commission found no evidence that SSD knew or should have known that the transition to BHA would fail (Decision at 65). Ms. Sundbakken requested a gradual reintegration plan in January 2025. SSD's coordinator recognized at the time that a half day might be needed and did not tell the parent. No IEP ever contained a transition plan, and SSD's behavior analyst wrote none and did not know whose responsibility it was. The Commission noted that E.S. was placed on a half-day plan when she returned to BHA in May 2025 and still could not transition (Decision at 65). That plan was adopted only after more than two months out of school caused by SSD's transportation failure, and BHA's director had warned that the gap would produce a significant escalation. It does not show that a planned, gradual reintegration in February 2025 would have failed.

**H. The Commission Erred in Dismissing Mehlville**

102. The Commission concluded that Mehlville bore no responsibility because it had not participated in E.S.'s IEP meetings or placement decisions (Decision at 43-44). As E.S.'s district of residence and a component district of SSD, Mehlville shares responsibility for ensuring that a FAPE and a continuum of placements are made available to her, and SSD itself required that E.S. remain enrolled in Mehlville. Mehlville's nonparticipation is a reason for, not a defense to, liability. The Commission also reasoned that E.S. is one of the very few children for whom a general education teacher is not a proper IEP team member (Decision at 44). That reasoning presumes the very determination that Regulation XV required a team including Mehlville to make annually.

103. The Missouri State Plan for Special Education, incorporated by reference at 5 C.S.R. 20-300.110, governs the division of responsibility between a special school district and its component districts. State Plan Regulation XV, Section C, makes it a matter of joint compliance for SSD and each component district to ensure that a continuum of alternative placements is available, to consider annually each student's placement in the least restrictive environment, to allocate instructional resources sufficient to provide appropriate services, to ensure participation with nondisabled students in nonacademic and extracurricular activities, 34 C.F.R. § 300.117, to maintain placement during proceedings, and to implement a final hearing decision. The continuum that Mehlville must jointly ensure includes special schools, home instruction, and instruction in institutions. 34 C.F.R. § 300.115(b)(1).

104. The Commission held that the location of a placement is an administrative determination for SSD alone (Decision at 44). Educational placement must be determined by a group that includes the parent, must be based on the child's IEP, and must be preceded by an IEP meeting before a child is referred to a private facility. 34 C.F.R. §§ 300.116(a)-(b), 300.325(a)(1).

Under Regulation XV, IEP team decisions bind both districts and may not be changed unilaterally at an administrative level in either. Parental agreement to excuse a team member from a meeting under 34 C.F.R. § 300.321(e) does not release that member's district from its obligations. Mo. Rev. Stat. § 162.890 relieves a component district of any requirement to establish schools or classes for students with disabilities and does not address its compliance duties under the State Plan.

105. Mehlville's own proposed findings conceded that no Mehlville representative attended any IEP meeting for E.S. from January 11, 2024 through June 12, 2026, that no one discussed E.S.'s return to a Mehlville school, and that Mehlville took no part in the search for a placement. Mehlville also conceded that implementation of a due process decision is a matter of joint compliance binding on it. Mehlville's witness testified that Mehlville did not attend E.S.'s IEP meetings because no one discussed her return to a Mehlville school, and the selection of a specific school for E.S. was handled by SSD's purchase-of-service coordinator outside any IEP meeting. No IEP team that included a Mehlville representative ever conducted the annual placement consideration that Regulation XV requires.

**I. The Commission Decided the Case on an Incomplete and Asymmetric Record**

106. Although the Commission had denied Defendants' request to limit evidence to the two-year period in its July 6, 2026 order, it granted Defendants' eve-of-hearing motion and excluded Plaintiffs' evidence of seclusion and restraint predating June 12, 2024. Under that ruling, Plaintiffs were unable to present approximately two hundred exhibits, principally E.S.'s disciplinary and seclusion and restraint records, and the thirty-six witnesses identified in their offers of proof. The Commission stated that Plaintiffs had been permitted to present substantial pre-June 2024 evidence as context (Decision at 3 & n.5), but it excluded the evidence showing why the less restrictive placements failed and what E.S. experienced in them. The two-year

limitations period governs which claims may be brought, not what evidence is relevant to timely claims, and the Eighth Circuit's residential-placement inquiry requires proof of what has been tried and failed. *T.F.*, 449 F.3d at 820-21.

107. Mo. Rev. Stat. § 536.070(7) provides that evidence to which an objection is sustained "shall, at the request of the party seeking to introduce the same . . . nevertheless be heard and preserved in the record." Plaintiffs made that request. The Commission did not receive the excluded testimony or exhibits into the record.

108. At the same time, the Commission relied on pre-June 2024 evidence favorable to Defendants, including E.S.'s disruption at Southview, a March 2024 psychologist interview, and the parent's April 2024 rejection of an offered day placement (Decision at 5-7, 24, 50, 54-55), and excluded the testimony of E.S.'s former Mehlville principal.

109. The Commission barred sixteen designated witnesses, including E.S.'s treating psychiatrist and psychologist and the clinical staff at Nexus, from offering opinions on E.S.'s treatment needs, and then found, based on the opinions of BHA's director, the Cornerstone consultant, a hospital administrator, and a private behavior analyst, after limiting Plaintiffs' designated witnesses to fact testimony on Defendants' motion, that E.S. required medical and psychiatric treatment before she could receive behavioral services and could not be educated in any setting less restrictive than homebound (Decision at 47, 55). Mo. Rev. Stat. § 490.065.1 governs expert testimony in the proceeding and imposes no written-report requirement, no rule or order of the Commission required opinion summaries, and neither side served them. Defendants could claim no surprise: they had the treating psychiatrist's written recommendation of residential placement, had met with the Nexus treatment team on July 20, 2026, and had themselves contracted with BHA and Cornerstone. The ruling removed the expert-consensus evidence the

Eighth Circuit has found significant. *See T.F.*, 449 F.3d at 821; *A.C.*, 258 F.3d at 777. The Commission's observation that the treating psychiatrist and psychologist had not observed E.S. in a school setting or met with the IEP team (Findings 20, 29) goes at most to weight. It describes clinicians whose letters were before the team, who had treated E.S. for years, and whose access to the team SSD itself controlled.

110. The Commission found that E.S.'s own explanations for her behavior, including her attribution of her resistance to a staff member to having been restrained at school, are not credible (Decision at 9 n.9). The Commission itself found that E.S.'s treating psychiatrist diagnosed post-traumatic stress disorder (Finding 19). Her psychiatrist and psychologist tied that diagnosis to restraint and seclusion at school. The Commission excluded the restraint and seclusion evidence that would have corroborated E.S.'s account and then found the account not credible.

111. The Commission excluded the Department of Justice's February 23, 2026 findings letter to SSD regarding its use of seclusion and restraint and its practice of reducing instructional hours and removing students with the greatest unmet needs to homebound instruction. The Department of Justice noted that a change in placement to a more restrictive setting should include an increase in services, yet there was no evidence that these students were provided more intensive behavioral services after the placement change. The Department's investigation covered the 2022-2023 and 2023-2024 school years and named Southview, and E.S.'s own incident data was among the data underlying its conclusions. The Department found that SSD regularly relies on outdated functional behavioral assessments and repeats the same ineffective interventions. Plaintiffs offered the letter as evidence of institutional practice and of Defendants' notice, not to establish a denial of FAPE. The Commission excluded it on the ground that it did not identify E.S. (Decision at 3 n.4).

112. The Commission imposed hearing-time limits that charged Defendants' cross-examination against Plaintiffs' time, preventing Plaintiffs from calling thirty-six disclosed witnesses and truncating Plaintiffs' examination of all witnesses. The Commission denied Plaintiffs' motion to compel the email of SSD's placement coordinator after she testified she had never searched her own account and could not remember the details of her activities without reference to the emails. After truncating the hearing time, the Commission imposed page limitations on post-hearing briefing, then changed the parameters after briefs were submitted and disregarded all but the first ten pages of Plaintiffs' reply briefs. The Commission found the hearing time sufficient and that Plaintiffs were not prejudiced (Decision at 3 n.3). That conclusion cannot be reconciled with the offers of proof identifying thirty-six witnesses whom Plaintiffs could not call, or with the Commission's later reliance on the absence of opinion evidence from the very clinicians it limited.

113. The Commission made a blanket credibility determination that SSD's witnesses and evidence were credible (Decision at 41), without reconciling that finding with the admissions of SSD's own witnesses described above. If those witnesses are credible, their admissions that homebound is more restrictive than a residential placement, that E.S. made no progress toward entering a school building or tolerating peers or unfamiliar adults, that no transition plan was ever written, and that ABA would have helped her are established.

114. The Decision contains other errors on its face. Its caption identifies the student as "B.S." It finds that E.S. was placed on homebound instruction at a May 25, 2023 IEP meeting (Finding 7) and that she began attending Southview in the fall of 2023 (Finding 6). It dates the change to homebound instruction as May 3, 2024 (Finding 56), yet finds that a Prior Written Notice following the April 9, 2024 IEP meeting proposed changing her placement to homebound

instruction (Findings 15-16). It finds that E.S.'s science and social studies instructor began in December 2025 (Finding 95) and describes that instructor's work with E.S. as of September 2025 (Finding 98). These inconsistencies bear on the weight the findings are due.

**COUNT I**

**Denial of a Free Appropriate Public Education, 20 U.S.C. § 1412(a)(1), § 1414(d)**

**(Against All Defendants)**

115. Plaintiffs incorporate the preceding paragraphs.

116. Defendants denied E.S. a FAPE from June 12, 2024 through the present by offering and implementing IEPs, including those dated on or about April 8, 2024, January 14, 2025, April 4, 2025, August 25, 2025, October 23, 2025, March 31, 2026, May 15, 2026, and July 13, 2026, that were not reasonably calculated to enable E.S. to make progress appropriate in light of her circumstances, that failed to address the behavioral and regulatory needs impeding her learning, and that provided a fraction of a school week of virtual instruction.

117. Defendants denied E.S. a FAPE by refusing in-person ABA, occupational therapy, and speech-language services under a categorical board policy rather than an individualized determination of her needs. 20 U.S.C. § 1414(d)(3)(B)(i); 34 C.F.R. § 300.324(a)(2)(i).

118. Defendants denied E.S. a FAPE by failing to timely and comprehensively evaluate her in all areas of suspected disability, including emotional disturbance, specific learning disability, and cognitive and academic functioning, and by relying on a functional behavioral assessment conducted where her disability could not be observed. 34 C.F.R. §§ 300.111, 300.301, 300.304.

119. Defendants denied E.S. a FAPE by failing to implement material provisions of her IEPs, including instruction and related services during 2025 and 2026, peer-interaction goals, and

her behavior intervention plan, and by offering instruction only through a means of delivery they knew E.S. could not reliably access. 34 C.F.R. §§ 300.17(d), 300.323. Defendants also failed to provide transportation, a related service, from March 5 to May 13, 2025.

120. Defendants denied E.S. a FAPE by failing to include in any IEP the program modifications and supports needed for her to advance toward her goals, including any plan to transition her from homebound instruction to a school setting, despite the parent's repeated requests for one. 20 U.S.C. § 1414(d)(1)(A)(i)(IV); 34 C.F.R. § 300.320(a)(4).

121. The Commission's contrary conclusions are erroneous as a matter of law and contrary to the preponderance of the evidence.

**COUNT II**

**Failure to Provide a Residential Placement in the Least Restrictive Environment, 20 U.S.C. § 1412(a)(5); 34 C.F.R. §§ 300.104, 300.115, 300.116**

**(Against All Defendants)**

122. Plaintiffs incorporate the preceding paragraphs.

123. Because of her disability, E.S. cannot reasonably be anticipated to benefit from instruction without a residential placement that integrates in-person behavioral support, therapeutic services, and peer interaction with her educational program. Public school, public separate day school, private separate day school, and more than two years of homebound instruction have each been tried and have failed.

124. Homebound instruction isolated E.S. from peers, provided no opportunity to address the behaviors that prevent her from attending school, and was not her least restrictive environment. For E.S., homebound instruction was more restrictive than a residential educational placement, as SSD's own placement coordinator admitted.

125. Defendants failed to make a residential placement available, refused the parent's request to change E.S.'s placement to residential, and based E.S.'s placement on availability rather than her IEP and individual needs. Defendants conditioned any residential placement on the parent or her insurer bearing the residential cost, contrary to 34 C.F.R. § 300.104.

126. The Commission's contrary conclusions rest on an incorrect legal standard and are contrary to the preponderance of the evidence.

**COUNT III**

**Procedural Violations, 20 U.S.C. §§ 1414(d), 1415(f)(3)(E)(ii); 34 C.F.R. §§ 300.322, 300.501, 300.503**

**(Against All Defendants)**

127. Plaintiffs incorporate the preceding paragraphs.

128. Defendants predetermined E.S.'s placement and services by foreclosing residential placement regardless of her needs, applying a categorical board policy to bar in-person services, and continuing homebound placement over the parent's objection without any transition plan. Cost and administrative convenience informed those decisions.

129. Defendants failed to issue prior written notice responding to the parent's requests for additional instructional hours, peer-based social skills instruction, transition services, and a paragraph-writing goal; did not respond to the parent's February 26, 2026 request for residential placement until July 13, 2026; and failed to issue timely prior written notice of E.S.'s eligibility under emotional disturbance. SSD's compliance office acknowledged internally on November 5, 2025 that no prior written notice had informed the parent of that eligibility.

130. Mehlville failed to participate in E.S.'s IEP meetings or placement decisions or to ensure that a continuum of alternative placements was available to her, as State Plan Regulation XV requires.

131. These violations impeded E.S.'s right to a FAPE, significantly impeded Ms. Sundbakken's opportunity to participate in the decision-making process, and caused a deprivation of educational benefit. 20 U.S.C. § 1415(f)(3)(E)(ii).

**REQUEST TO HEAR ADDITIONAL EVIDENCE**

132. Pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii) and Mo. Rev. Stat. § 162.962(1)(b), Plaintiffs request that the Court hear additional evidence, including: (a) the witnesses and exhibits identified in Plaintiffs' September 2 and 3, 2026 offers of proof, including the approximately two hundred excluded exhibits that Plaintiffs tendered on September 22, 2026 and that the Commission did not receive into the administrative record; (b) the witnesses excluded from testifying by the time limits imposed by the Commission; (c) the opinion testimony of E.S.'s treating clinicians and Nexus clinical staff regarding her educational and placement needs; (d) the Department of Justice findings letter of February 23, 2026; (e) the email of Melissa Wilson and other responsive communications Defendants did not produce; (f) evidence regarding E.S.'s progress, needs, and placement after the administrative record closed, including her placement following Plaintiffs' October 12, 2026 notice, offered as bearing on the appropriate remedy; and (g) evidence bearing on the appropriate compensatory and prospective relief.

133. A party seeking to introduce additional evidence must provide some solid justification for doing so. *Indep. Sch. Dist. No. 283 v. S.D. ex rel. J.D.*, 88 F.3d 556, 560 (8th Cir. 1996) (quoting *Roland M. v. Concord Sch. Comm.*, 910 F.2d 983, 996 (1st Cir. 1990)). Plaintiffs offered the evidence described in (a) through (e) at the hearing, the Commission excluded it or declined to compel it, and Plaintiffs made timely offers of proof identifying each witness and exhibit and the substance of the testimony. Improperly excluded evidence and evidence of relevant

events after the hearing are recognized grounds for supplementation. *Town of Burlington v. Dep't of Educ.*, 736 F.2d 773, 790 (1st Cir. 1984), *aff'd*, 471 U.S. 359 (1985).

134. This Court has previously permitted a parent to supplement the record in an appeal from the Commission with testimony she was unable to present because of the Commission's presentation-time limits. *G.A. v. Special Sch. Dist. of St. Louis Cnty.*, No. 4:25-cv-01685-SRW (E.D. Mo. Aug. 18, 2026).

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that the Court:

a. Receive the records of the administrative proceedings and hear the additional evidence described above;

b. Reverse the Decision of the Administrative Hearing Commission in Case No. 26-0821;

c. Declare that Defendants denied E.S. a free appropriate public education from June 12, 2024 through the present and violated the procedural requirements of the IDEA;

d. Order Defendants to place E.S. in, and fund at no cost to Plaintiffs, an appropriate residential educational program, including non-medical care, room and board, tuition, related services, and reasonable travel and family-visitation costs, 34 C.F.R. § 300.104, together with the in-person behavioral, occupational therapy, speech-language, and therapeutic services necessary to meet her needs;

e. Order Defendants to reimburse Plaintiffs for the costs of any appropriate private placement and services they have obtained or obtain for E.S. as a result of Defendants' denial of a FAPE, including transportation costs, *Sch. Comm. of*

*Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70 (1985); *Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15-16 (1993); *Steckelberg*, 77 F.4th at 1170-71;

f. Award compensatory education sufficient to place E.S. in the position she would have occupied but for Defendants' violations, including for lost instructional time, missed related services, and the behavioral services she was denied, and including the instruction lost during her hospitalizations and the 2026 extended school year;

g. Order Defendants to revise E.S.'s IEP consistent with the Court's judgment, including changing placement to residential, and adding appropriate behavioral, peer-interaction, and transition goals and services;

h. Order that all relief be implemented jointly by SSD and Mehlville, consistent with the joint-compliance obligations of the Missouri State Plan for Special Education, Regulation XV;

i. Award Plaintiffs their reasonable attorneys' fees and costs incurred in the administrative proceedings and in this action under 20 U.S.C. § 1415(i)(3)(B); and

j. Grant such other and further relief as the Court deems just and appropriate.

DATE: November 20, 2026

Respectfully submitted,

**DRAGAN LAW FIRM, LLC**

/s/ Diane L. Dragan
Diane Dragan, MO #73591
131 Prospect Ave. Suite A
Kirkwood, MO 63122
Phone: (314) 788-7323
Diane@Draganlawfirm.com

**JUSTITIA LLC**

/s/ Alicia I. Dearn
Alicia I. Dearn, #64623MO
4428 Louisiana Avenue
St. Louis, MO 63111
Tel: (314) 887-1100
notices@dearnlaw.com

*Attorneys for Plaintiffs*